## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | 2:23-cr-00085 |
| | ) | |
| | ) | |
| WAYNE WILLIAMS | ) | |
| | ) | |
| | ) | |

## <u>OPINION</u>

**Mark R. Hornak, United States District Judge**

This Opinion addresses the Defendant Wayne Williams's ("Defendant" or "Williams") written and supplemental oral Motion to Suppress evidence from the search of a residence at 510 Lincoln Avenue in the City of Pittsburgh, at which he claims that he was an overnight visitor. (ECF No. 93). The Motion requests that all evidence obtained pursuant to or as a result of the search warrant issued by a state court judge on December 29, 2021, for 510 Lincoln Avenue, Pittsburgh, Pennsylvania, be suppressed from the record of this case. (*Id.* ¶ 15).

The original suppression motion, (ECF No. 93), filed by one of Williams' former counsel, was supplemented by further filings by his current counsel, (ECF Nos. 146, 156). Those supplements include new arguments, along with new and novel "spins" on prior arguments, all of which the Government has been permitted to respond to, and has done so, over its objections to the Defendant renewing or expanding his Motion. There have also been multiple in person proceedings concerning the Motion to Suppress: an evidentiary hearing on April 3, 2025, involving one of several prior defense counsel, and two oral arguments, one on October 16, 2025, and one on December 17, 2025, each involving current defense counsel. (ECF Nos. 121, 155, 200). At the most recent oral argument, defense counsel, over the Government's objection, articulated either a

1

"new" oral suppression motion, or another novel take on the Motion previously made. The Court permitted the Government to address those developments, and it did so, forcefully and in writing the next day, arguing that Williams should not be permitted to again supplement his suppression Motion. (ECF No. 200). The Government with Court authorization then responded to an additional argument raised in the oral suppression motion, (ECF No. 199), and the Defendant replied, (ECF No. 203). After considering the record from the multitude of proceedings, the detailed briefing from the Defendant and Government, and supplemental evidence submitted to the record by both the Defendant and the Government, the Court DENIES the Motion to Suppress at ECF No. 93, including in each and all of its iterations, amendments and supplements.

## I.    Background

On December 18, 2021, a shooting occurred outside the now-defunct Ace's & Deuce's Lounge located in the Pittsburgh neighborhood of Uptown in an area known as the Hill District. Subsequently, the Pittsburgh Bureau of Police ("PBP") Violent Crime Unit launched an investigation into that event, (ECF No. 93-2, at 2), which came to involve the United States Marshal Service ("USMS") Western Pennsylvania Fugitive Task Force, (ECF No. 93-3, at 2). Evidence as recounted in multiple warrant affidavits led police officers to apply for and obtain arrest warrants for Wayne Williams and his friend, (Ms.) Jamie Koon, as well as search warrants for Koon's residence at 510 Lincoln Avenue and the alleged shooting getaway vehicle, a silver Chrysler Sebring, which was registered to Jamie Koon at 510 Lincoln Avenue.

The initial arrest warrant for Williams was signed by Magisterial District Judge Jack Kobestic on December 27, 2021. (ECF No. 93-3, at 3). On December 29, 2021, at 1:11 PM, Senior Magistrate Judge Randy C. Martini signed a warrant to seize and search Jamie Koon's Chrysler Sebring for evidence related to the shooting. (ECF No. 156, at 15; ECF No. 156-9). At 1:16 PM

that day — December 29, 2021 — Allegheny County (PA) Court of Common Pleas Judge Kelly E. Bigley signed an arrest warrant for Wayne Williams and Jamie Koon. (ECF No. 93, ¶ 11; ECF No. 93-3). Also on that day — December 29, 2021 — at 3:22 PM, Judge Bigley signed a search warrant for 510 Lincoln Avenue for "evidence related to [the] crime [at Ace's & Deuce's] including firearms ammunition, firearms accessories." (ECF No. 93-2, at 3).

The arrest of Wayne Williams and the search of 510 Lincoln Avenue occurred in the early morning hours of December 30, 2021, the day after the car, residence, and Judge Bigley arrest warrants were signed. The execution of the residence search warrant began at approximately 6:40 AM that day. (ECF No. 156, at 11–12). Wayne Williams was arrested at 510 Lincoln Avenue at 6:51 AM, detained, and transported to a Pittsburgh Police station. (*Id.* at 12). During the execution of the 510 Lincoln Avenue search warrant for evidence related to the shooting, officers observed evidence of the presence of illegal narcotics. (*Id.* at 13). Officers then contemporaneously applied for and received a *second* search warrant for 510 Lincoln Avenue, authorizing a search for "[a]ny illegal narcotics, packaging materials for drug sales, scales" and other items related to drug activity. (ECF No. 156-8, at 1). That warrant was signed by Judge Bigley at 8:05 AM on December 30, 2021, the date the original search warrant was being executed. (*Id.*). That second Lincoln Avenue search warrant — for evidence of narcotics — is not the *subject* of the Defendant's Motion to Suppress (nor is the Chrysler Sebring search warrant), but the Defendant's Motion asserts that all evidence obtained pursuant to that second 510 Lincoln Avenue search warrant must be suppressed as well, pursuant to the "fruits of the poisonous tree" doctrine. (ECF No. 93, ¶ 15).

In particularly relevant part, the affidavit of PBP Detective Justin Knight in support of the challenged search warrant for 510 Lincoln Avenue (the first Judge Bigley search warrant) recounts the following facts:

- The Pittsburgh Police were investigating the shooting outside Ace's & Deuce's that occurred on December 18, 2021.
- Evidence of several 9 mm spent shell casings was obtained at the scene outside Ace's & Deuce's.
- Camera footage from the intersection shows a "black male wearing a black colored hooded jacket with light colored stripes on the sides wearing a black hat" enter Ace's & Deuce's.
- That same male later appeared on the video to shoot a gun into the driver side area of a vehicle occupied by an older man as it passed in front of the Lounge.
- That same male appeared to then enter a light silver Chrysler Sebring.
- Other cameras capture that same silver Chrysler traveling toward downtown Pittsburgh and then towards the Bloomfield neighborhood.
- A license plate reader captured the Chrysler's plate as Pennsylvania KXY-4958.
- The license plate PA KXY-4958 is registered to Jamie Koon, who resides at 510 Lincoln Avenue.
- Detective Knight, the affiant, reviewed the video footage from inside Ace's & Deuce's. He attested that the same male as was seen in the interior camera footage is seen firing the gun outside the Lounge. In that interior video, although the suspect is initially wearing a COVID face mask, he later takes it off clearly disclosing his full face.
- PBP Detective E. Fallert was shown the video footage, and Detective Fallert identified the subject as Wayne Williams.
- Fallert was "familiar with the suspect from prior encounters and arrest."
- Williams is not allowed to possess a firearm because he is a convicted felon.
- Police surveil 510 Lincoln Avenue on December 27 and December 28 of 2021.
- Detective Knight filed for an arrest warrant for Williams on December 28.
- Koon is seen entering the silver Chrysler Sebring outside 510 Lincoln Avenue on December 28.
- "[A] male matching the physical characteristics and description of Wayne Williams" exits 510 Lincoln Avenue twice on December 29.

(ECF No. 93-2).

As stated above, this Court has held three hearings on the pending Motion on April 3, 2025; October 16, 2025; and December 17, 2025. The first was a full evidentiary hearing; the other two were oral arguments involving Williams' current counsel on the suppression motion. Following the second proceeding, the Defendant filed a Motion to Supplement the Record. (ECF No. 156). The Court granted that Motion and allowed the Government to respond, which it did. (ECF No. 179). The Defendant submitted video footage of Williams while he was in an interview room at

the PBP station on the day of his arrest, police body camera footage from 510 Lincoln Avenue, the drug search warrant application for the Lincoln Avenue residence from December 30, 2021 (the second Judge Bigley warrant), and the Chrysler Sebring search warrant application from December 29, 2021. (ECF No. 156, at 3).

In response, the Government submitted the arrest warrant and supporting affidavit for Jamie Koon and Wayne Williams, the PBP investigative report for possession of drugs and firearms by Williams from December 30, 2021, and information concerning Williams's criminal history. (ECF Nos. 179-1, 179-2, 179-3). Then, at the argument on December 17, 2025, the Defendant introduced Defendant's Exhibit 10, which depicts video footage from the body camera of one of the officers on the scene at 510 Lincoln Avenue on December 30, 2021, when the search based on the first Judge Bigley warrant was being executed. The Government opposed the introduction of that exhibit, and it subsequently filed a brief in opposition to the "old" and "new" arguments advanced by the Defendant at the proceeding on December 17, 2025. With the Court's permission, the Government provided video content that was part and parcel of the overall body camera footage proffered by the Defendant, as authorized by the Court under the "rule of completeness." Fed. R. Evid. 106. All of the proffered evidence was eventually admitted to the record by the Court.

## II.    Parties' Arguments

The written Motion to Suppress, (ECF No. 93 and supporting brief at ECF No. 94), argues that the affidavit that supported the first search warrant for 510 Lincoln Ave, authored by PBP Detective Justin Knight, was insufficient to support probable cause for such a search. (ECF No. 93-2). The Defendant's latest supplemental oral Motion, as expressed for the first time at the oral argument on December 17, 2025, asserts that the evidence obtained pursuant to the search of 510

Lincoln Avenue also must be suppressed because police officers did not provide a copy of the search warrant to Williams when he asked for a warrant as he was being arrested. For the reasons outlined below, the Court denies the Motion in its entirety and in all of its subsequent iterations.

Williams asserts that Detective Knight intentionally or recklessly made material omissions in his search warrant affidavit for 510 Lincoln Avenue and that, if such omissions had been included in the affidavit, the issuing judge could not have found probable cause to issue the search warrant. In particular, the Defendant asserts that the affidavit intentionally or recklessly omitted two things — the failure of the shooting victim from the Ace's & Deuce's Lounge to positively identify Williams from a photo array, and the fact that Detective Fallert, who the affidavit said had positively identified Williams to Detective Knight based on Detective Fallert having watched the video footage of the shooting, had allegedly not seen Williams for anywhere from 10 to 18 years. The Defendant argues that these omissions if included in the affidavit would so undermine the judge's determination of probable cause that when the affidavit is "reformed" to cure those omissions, there would not be probable cause for its issuance.

Williams makes several other arguments regarding the warrant to search 510 Lincoln Avenue. He asserts that there is not sufficient evidence connecting him personally to 510 Lincoln Avenue. (ECF No. 146). He also asserts that, based on the transcript of the hearing on April 3, 2025, (ECF No. 134), Detective Knight relied on an anonymous tip to determine the identity of Williams from the video footage.[1] (ECF No. 146, at 5). The Government counters that Detective

---

[1] During the Government's direct examination of Detective Knight at the evidentiary hearing on April 3, 2025, Detective Knight told the Court that "there's a report somewhere where an officer is given [Wayne Williams's] name at the scene" of the shooting outside Ace's & Deuce's on December 18, 2021. (Apr. 3, 2025, Hearing Transcript, ECF No. 134, at 63:12-13). Detective Knight explained that that report was what led Detective Knight to put Wayne Williams's name into the system to generate a photo array including a photograph of Wayne Williams to show the victim of the shooting. Consequently, Detective Knight did not seek a search warrant based only on a tip, but that report to a responding officer got the ball rolling for Detective Knight's investigatory development of the facts recounted in his warrant affidavit.

Knight used the anonymous tip as a starting place to develop Williams as a suspect and "continued to investigate, using other investigative means to establish probable cause that the defendant was the shooter." (ECF No. 147, at 3 n.2). The Defendant also argues — for the first time at the most recent oral argument — that the twelve days between the shooting and the execution of the search at 510 Lincoln resulted in the evidence underlying the affidavit becoming unduly stale. And, also for the first time at the most recent oral argument, the Defendant posits that the evidence must be suppressed from the search because police officers did not present the warrant to him when he asked for it while being arrested.

The Government responds by asserting that the Defendant has not demonstrated that there were any material omissions at all from the search warrant affidavit; that if there were any omissions, the Defendant has not shown that such omissions were made intentionally, knowingly, or with reckless disregard for the truth; and that any alleged omissions were not material to the probable cause finding. Regarding the identification of Williams by Detective Fallert, the Government states that "given the quality of the Ace's Deuces video, once one knows who Williams is, it is obvious that he is the person in the video." (ECF No. 147, at 3 n.2). It also avers that including details about what happened during the photo array with the victim actually would have strengthened the affiant's case for probable cause for the search warrant, not weakened it, because the victim selected two photographs from the array of eight photos, saying the suspect was one of those two individuals — and one of those two images was of Wayne Williams. (ECF No. 147, at 6–7).[2]

Likewise, the Government opposes the Defendant's other arguments concerning the sufficiency of the evidence supporting the search warrant. Very quickly after the oral argument on

---

[2] The Government also argues that some of the grounds for Williams's Motion to Suppress are untimely; the Court does not address those arguments here because the Motion fails on the merits.

December 17, 2025, the Government filed a Response in Opposition to the Defendant's December 17 Oral Motion to Suppress. (ECF No. 199). In that filing, the Government vigorously rejects Williams's claim that evidence from the search of 510 Lincoln Avenue should be suppressed because the police officer supposedly did not immediately give Williams the search warrant during his arrest.

Based on the record facts and the law recounted below, the Court concludes that the issuing judge had a "substantial basis for concluding that probable cause existed to uphold the warrant," *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000), and that that is the result even if — and, perhaps, especially if — the full panoply of information that Williams says was omitted were to be in the hypothetical "reformed" affidavit, including evidence that he has now put before the Court. The Court also concludes that there was no impropriety concerning the response to Williams's request to see the warrant during his arrest on December 30, 2021. There is therefore no cause for this Court to grant the Defendant's Motion to Suppress, as the evidence was obtained pursuant to a lawful search warrant. The Motion is DENIED.

## III.    Standard of Review

Because "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause," the Supreme Court has instructed reviewing courts to start from a place of deference to a magistrate's determination of probable cause to support a warrant. *United States v. Leon*, 468 U.S. 897, 914 (1984); *United States v. Rivera*, 347 F. App'x 833, 837 (3d Cir. 2009); *United States v. Smith*, 720 F. Supp. 3d 384, 388 (W.D. Pa. 2024) ("Magistrate judges (or state court judges) reviewing search warrant applications regularly defer to the assessments of experienced law enforcement officers on matters within their competence, and reviewing courts . . . must defer to [magistrate judges'] credibility determinations.").

Of course, deference to the issuing magistrate is not unlimited. Reviewing courts are permitted to inquire into the alleged knowing or reckless falsity of the affidavit upon which the determination was based; the sufficiency of information included in the affidavit so as to prevent the magistrate court from becoming a "rubber stamp" for law enforcement; and whether the warrant was improperly issued, after its consideration of the totality of the circumstances. *Leon*, 468 U.S. at 914–15. Courts reviewing magistrate determinations of probable cause must "confine [their] review to the facts before the magistrate judge, *i.e.*, the affidavit, and [] not consider information from other portions of the record." *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993).

Below, the Court addresses each of the Defendant's arguments: first his argument regarding the insufficiency of the evidence underlying the affidavit, then his late arriving staleness argument, and then his really late arriving argument concerning the warrant not being presented to him during his arrest. Following those considerations, the Court disposes of the Defendant's additional arguments concerning the Motion that do not fall neatly into those three buckets (and it strikes the Court, are ultimately irrelevant to the disposition of this Motion).

## IV.    Analysis

The Fourth Amendment protects persons from unreasonable warrantless searches and seizures. It is one of the most sacred and enshrined rights in the land. A central goal of the case law that has developed around the Fourth Amendment has been to incentivize law enforcement compliance with the warrant requirement. *Aguilar v. State of Tex.*, 378 U.S. 108, 110–11 (1964). For that reason, there is a relatively high bar to disprove the constitutionality of a search or seizure for which law enforcement sought and received a warrant from a magistrate judge. *United States v. Leon*, 468 U.S. 897, 914 (1984).

### A.  Defendant's Sufficiency of Evidence of Probable Cause Arguments

A magistrate judge may find probable cause for police to seek, obtain, and execute a search warrant when, considering the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). An affidavit does not have to express *certainty* about finding evidence in the premises to be searched. The Third Circuit has said that "an issuing court need only conclude that it would be reasonable to seek the sought-after objects in the place designated in the affidavit; a court need not determine that the evidence is in fact on the premises." *United States v. Ritter*, 416 F.3d 256, 263 (3d Cir. 2005).

Generally, and in the present case, the magistrate judge's decision to issue a warrant is based on one or more affidavits from law enforcement personnel. If "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and the allegedly false statement is necessary to the finding of probable cause," the Fourth Amendment requires the contents of the search to be excluded from the record of the case as fruits of the poisonous tree. *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). Our Court of Appeals has interpreted "reckless disregard for the truth" to include omissions of material exculpatory information. *See Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997). This does not mean that affidavits supporting warrants have to include *all* facts known to law enforcement. Omissions are only made with reckless disregard for the truth "if an officer withholds a fact . . . that any reasonable person would have known [] was the kind of thing the judge would wish to know." *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000) (cleaned up).

An *ex poste* challenge to the sufficiency of the facts recited in an affidavit supporting a finding of probable cause is called a *Franks* challenge. To obtain a *Franks* hearing, a defendant

must show "(1) that a warrant application contained false statements made with reckless disregard for the truth and (2) that the remaining truthful statements, standing alone, do not establish probable cause." *United States v. Desu*, 23 F.4th 224, 234 (3d Cir. 2022). "If a defendant succeeds in obtaining a hearing, he must then prove the allegations by a 'preponderance of the evidence' at the hearing itself in order for a judge to suppress evidence obtained as a result of the warrant." *Id.*

On April 3, 2025, the Court conducted a *Franks* hearing on Williams's suppression motion, based not on any express finding by the Court that there had been an impermissible false statement or material omission, but instead on the basis that the nature of the claims as asserted were such that it was advisable to conduct such a hearing to have the necessary factual record to assess the Defendant's allegations about alleged omissions. (ECF No. 121). The Court must now determine "whether the officers, with at least a reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for the warrant, and . . . whether those assertions or omissions were material, or necessary, to the finding of probable cause." *Andrews v. Scuilli*, 853 F.3d 690, 697 (3d Cir. 2017) (cleaned up). The Court assesses each of the challenges to the sufficiency of the affidavit supporting the warrant in turn and then all of the challenged elements as an aggregate.

### 1. Victim Photo Array

Williams alleges that Detective Knight's affidavit that led to Judge Bigley granting the first search warrant for 510 Lincoln Avenue recklessly disregarded the truth because it contained material omissions, namely concerning the shooting victim's failure to conclusively identify Williams in a photo array conducted shortly after the shooting. Williams argues that if Detective Knight had been fully "honest" in his affidavit, Judge Bigley would not have issued the search warrant. The Court rejects the Defendant's argument, concluding that Detective Knight did not

make statements in the affidavit with reckless disregard for the truth by omission or otherwise, and beyond that, if the complete additional information known to Detective Knight and advanced into the record was included in a "reformed" affidavit, there would have been even more probable cause supporting the warrant affidavit and issuance of the warrant.

As the Court noted on the record at the hearing on October 16, 2025, if additional details were to be hypothetically inserted into the affidavit, those details would not be limited to only the details favorable to the Defendant. This principle derives from *United States v. Frost*, wherein an affiant did not mention an unsuccessful K-9 dog sniff test in an affidavit for a search warrant. 999 F.2d 737, 743 (3d Cir. 1993). In that case, the Third Circuit said that the relevant comparator was whether disclosure of *all* relevant information regarding the asserted omission would have undermined probable cause, which in *Frost*, meant including not only that the sniff was unsuccessful, but also that drug dealers often use scent masking techniques to throw off K9 sniff tests. *Id.* In the present case, the relevant comparator is not an affidavit that simply states that the victim made no conclusive identification in the photo array. The relevant comparator is an affidavit that states that the victim identified two images from the eight photographs in the array and said that he believed the suspect was one of those two people, and that one of those two was Williams. It is *that* scenario that the Court must consider when evaluating whether the warrant application contained omissions made with reckless disregard for the truth.

The seminal case in this Circuit concerning the reckless disregard for the truth standard as applied to warrant affidavits is *Wilson v. Russo*, 212 F.3d 781 (3d Cir. 2000). In that case, the court held that a significant differential between the height of the defendant and the suspect in an investigative report and the fact that a victim did not pick the defendant out in a photo array constituted material information that should have been included in the affidavit. *Id.* at 788. The

affiant should have included in his affidavit to the magistrate judge that one of the victims "concluded that he could not say with certainty that he recognized the robber" in the photographic array. *Id.* at 785.

In the present case, the Defendant is correct that, according to the law in this Circuit, the victim's failure to identify the defendant in a photo array is something that a "reasonable person would know that a judge would want to know." *Id.* at 783. However, it is also clear from the record and the Court's assessment of his testimony in open Court that Detective Knight did not withhold facts because he "entertained serious doubts as to the truth of [the] statements [in the affidavit] or had obvious reasons to doubt the accuracy of the information provided," which is necessary to establish that an assertion is made with reckless disregard of the truth. *Stafford v. Morris*, 816 F. App'x 712, 715 (3d Cir. 2020) (quoting *Andrews*, 853 F.3d at 698).

The Court does not find that Detective Knight acted recklessly by not disclosing the results of the photo array. Instead, it is clear to the Court, considering the record as a whole, that Detective Knight did not disclose the results of the photo array because of the "100% certainty policy" of the local District Attorney's Office. Under that policy, any identification made by a witness or victim without 100 percent certainty is not considered "successful." (ECF No. 147, at 4). Detective Knight's omission — having been based on the "100% certainty policy" of the District Attorney's Office — falls into the category of those omissions that are either perfectly permissible, or at most a result of "negligence or innocent mistake," which is insufficient to establish the first prong of a *Franks* violation.[3] *Wilson*, 212 F.3d at 787 (quoting *United States v. Davis*, 617 F.2d 677, 694 (D.C.Cir.1979)). But there is more on this point.

---

[3] On this point, the Defendant contends that Detective Knight's testimony that he did not include information about the photo array because "I didn't see that it had PC into my—it didn't present probable cause to my affidavit", (ECF No. 146, at 2), meant that Detective Knight intentionally omitted information that would have steered the issuing judge away from issuing the search warrant for 510 Lincoln Avenue. As noted below, the complete information

The shooting victim picked out *two* images from the photo array,[4] which consisted of eight images, saying he believed that the suspect was one of the two. As the Defendant recounts in his supplemental briefing, the victim motioned to two of the eight photos from the array, one of which was an image of Wayne Williams, and said, "These two right here. Could be them two." (ECF No. 156, at 18). Had Detective Knight provided the issuing judge a *full* explanation of what occurred during the photo array with the victim, the judge's assessment of probable cause would not have been impaired or diminished; she would have had even more reason to find probable cause to grant the search warrant, as the victim did identify the Defendant — albeit not exclusively and not with complete certainty, but as one of two photos that could have been of the shooter.

As stated above, the two prongs of the *Franks* test are that the Defendant shows, by a preponderance of the evidence, "(1) that a warrant application contained false statements made with reckless disregard for the truth and (2) that the remaining truthful statements, standing alone, do not establish probable cause." *Desu*, 23 F.4th at 234. The Defendant's failure to prove the first prong — that the warrant application contained statements made with reckless disregard for the

---

from the photo array would, in the Court's judgment, have bolstered probable cause in support of the warrant. And more importantly, based on the Court's assessment of all of Detective Knight's suppression hearing testimony, his decision to not reference the array in the warrant affidavit was driven by his understanding of the protocols of the District Attorney's Office as to when a police officer could reference the results of a photo array in a warrant affidavit at all, *e.g.*, it did not add to "PC" because under the rules of that Office, it could not be referenced absent a "100% certain" victim identification. And to close the loop, the Court is not aware of, and the parties have not cited to, any caselaw that ties measuring probable cause for a search warrant to the necessity for a 100% identification from a photo array.

[4] At the most recent oral argument on December 17, 2025, defense counsel offered a vague assertion that the victim identified three, rather than two, of the photographs in the photo array as the potential suspect. But the Court has reviewed the transcript of the photo array conducted with the victim, (ECF No. 156, at 16–18), and finds that the victim identified two, not three, photographs who he said "could be" the suspect. And in any event, given that the Court concludes that Detective Knight's omission of information about the array was driven by his understanding of the reach of the local District Attorney's "100% certainty" rule, even if Williams was one of three, rather than one of two, such a change does not advance the ball in Williams' favor. Perhaps if the victim did not include Williams at all thereby arguably excluding him completely from the scene, that in theory could have tipped the probable cause analysis the other way. But that is not the situation here. And beyond all of that, as noted below, even if the photo array result is viewed as cutting in Williams' favor because the victim did not identify him with complete certainty and only as one of two or three possible suspects, the balance of the information contained in the warrant affidavit was more than sufficient to support the issuance of the warrant.

truth — is fatal to his Motion to Suppress on the basis that the information about the photo array should have been included in the affidavit. But even if it were not, including all of the information on this point would have actually added to the probable cause presented to the issuing judge.

2.    Detective Fallert's Familiarity With Defendant

We now turn to Williams's claim that Detective Knight acted with reckless disregard of the truth by omitting the asserted fact that Detective Edward Fallert had not seen the Defendant in somewhere between 10 and 18 years at the time he identified Williams to Detective Knight from the video of the shooting, a timeline that would suggest that Fallert could not logically remember what Williams looked like.

The parties dispute when Detective Fallert last saw the Defendant. The Government avers that Detective Fallert interacted with the Defendant at some point at least within the five years prior to the incident on December 18, 2021. (ECF No. 147, at 14 n.8). Williams asserts that Detective Fallert had not seen him since before Detective Knight started with the PBP in 2011. (*Id.*). Both Detective Knight and Detective Fallert testified at the evidentiary hearing on April 3, 2025. That testimony was fully credible and demonstrated that as Detective Knight was preparing the warrant affidavit, Detective Fallert watched the Ace's & Deuce's video and told Detective Knight that the person doing the shooting in the video footage was "absolutely" and "100%" Wayne Williams.[5] (*Id.* at 5).

---

[5] The Defendant's argument on this point is that when Detective Knight testified at the suppression hearing, he stated that Detective Fallert knew Mr. Williams from a "long time ago," that Detective Fallert had previously arrested Williams in a "gun case" and that Detective Fallert had a prior encounter with Williams before Detective Knight came on the job around 2009. (ECF No. 146, at 8). The Defendant argues that these facts necessarily mean that Detective Fallert had not seen Williams for at least 10 years before identifying Williams to Detective Knight as Knight was preparing the warrant affidavit. (ECF No. 156-2). Not so. As the Government points out, Fallert testified that he also told Detective Knight that he, Detective Fallert, had arrested Williams at least twice in the past, and that he had in fact seen Williams outside of the Allegheny County Courthouse around the time the "gun case" had gone to trial, which appears to have been about 10 years before the affidavit was being authored. But as Williams acknowledges, when asked what Detective Fallert told Knight about how he knew Williams, Detective Fallert also testified that he had also seen Williams outside of 510 Lincoln Avenue with his "girlfriend" who lived at that

To attempt to undercut the credibility of that assertion, and therefore that of Detective Fallert, the Defendant introduced supplementation into the record of the video of Williams greeting and then interacting with Detective Fallert in a PBP interrogation room shortly after his arrest. (ECF No. 156-2). The Court finds that the omission from the warrant affidavit of the date of the last time Detective Fallert saw Williams, and that date falling more than 10 years prior — if it can even be categorized as an omission — was not made with reckless disregard for the truth and was not material.

Detective Fallert has been a PBP homicide detective for 11 years and a PBP police officer for 31 years. (ECF No. 147, at 4). Detective Fallert testified that he often reviews video surveillance footage to assist in investigations across the PBP. (*Id.* at 5 n.4). The Government avers that no one, including Detective Knight, told Detective Fallert that Wayne Williams was a suspect before Detective Fallert identified him in the shooting video, (*id.* at 5), and Detective Fallert testified to the same, (Apr. 3, 2025, Hearing Transcript, ECF No. 134, at 73:21-74:1). The Defendant seemingly does not believe that assertion but presents no evidence to the contrary.

At the evidentiary hearing on April 3, 2025, Detective Fallert testified that he knew Wayne Williams from multiple interactions. When asked if the most recent time he saw Williams was

---

address (the address where Jamie Koon lived). (ECF No. 156, at 9). And when asked to peg when that encounter occurred, Detective Fallert placed it at less than five years before his conversation with Detective Knight. So, once again, the complete picture that might be added to the affidavit would not in the Court's judgment have diminished the basis for a probable cause finding.

And to the extent the Defendant seeks to call into question the credibility of Detective Fallert's testimony generally or as to what he told Detective Knight, the credibility of Detective Fallert's testimony was bolstered almost immeasurably by the speed and enthusiasm with which Williams greeted Detective Fallert in the PBP interview room, as seen in the video introduced into the record by Williams. As set out below, Detective Fallert acknowledging that it had been "a while" since he had seen Williams in no way corroborates Williams' statement in the interview room video that it had been "18 years," nor is it at all inconsistent with Fallert having seen Williams outside of 510 Lincoln Avenue less than 5 years before. Finally, no matter the definition of "in a long time," the immediate mutual recognition between Detective Fallert and Williams from Defendant's Exhibit 1, (ECF No. 156-2), indicates that Detective Fallert would have been able to make an accurate identification of Williams no matter the number of years involved.

"more or less than five years before the 2021 incident," Detective Fallert said that he "would say [it was] less than" five years prior to the 2021 incident that he had last seen Williams. (*Id.* at 75:22-24). Detective Fallert testified as follows:

**Q.** And can you explain what you relayed to Detective Knight?

**A (Detective Fallert).** That I knew the guy, that I had arrested him. His name is Wayne Williams. He goes by the nickname Flack or Flack Duty.

**Q.** And can you describe for Detective Knight how you knew Wayne Williams?

**A.** Yes.

**Q.** How is it that you know Wayne Williams?

**A.** I arrested him at least — well, twice that I remember dealing with him directly. I also knew him from seeing him on like the street or put. I saw him in the Allegheny County Courthouse. I saw him on Lincoln Avenue with the female who he identified as — I asked him what he was doing there and he said I'm here with my girlfriend. She lived — "My girl lives here," I believe is exactly what he told me.

**Q.** And do you remember about how long that was before the December 2021 incident?

**A.** I believe that was after I saw him in the courthouse. And I believe at that time I asked him what happened with his case and he said, "I beat that." I believe that was at that time that he told me that.

**Q. S**o if you had to put a ball park, would you say more or less five years before the 2021 incident?

**A.** I would say less than.

(*Id.* at 75:2-24). When asked if there was "any doubt in [his] mind about who the individual in the video was," Detective Fallert answered, "No. I told [Detective Knight], it's absolutely him. You know, 100%, that's Wayne Williams." (*Id.* at 75:25-76:5).

The Government asserts, and the Court agrees that the evidence shows, that Detective Knight had "no reason to doubt the accuracy of the identification" made by Detective Fallert. (ECF No. 147, at 5). It strikes the Court as legitimately discretionary for Detective Knight to include or not the date of the last interaction between Detective Fallert and Williams in the affidavit, and improper to consider the omission of such a date a reckless disregard for the truth. As our Court of Appeals has stated, "We cannot demand that police officers relate the entire history of events leading up to a warrant application with every potentially evocative detail that would interest a novelist or gossip." *Wilson*, 212 F.3d at 787. The actual evidence in the record on this point reveals no basis for Detective Knight to harbor any doubts as to what Detective Fallert told him upon viewing the shooting scene video, so there would have been no duty triggered to tell the issuing judge more on this topic.

It is also important to note that the Defendant has not backed up his assertions about when Detective Fallert last interacted with the Defendant with actual evidence, *e.g.*, that it was necessarily 10 or even 18 years prior. The closest he comes is in the supplemental video evidence submitted by the Defendant, entitled Defendant's Exhibit 1 (ECF No. 156-2), which — in the Court's judgment — does not undermine the conclusion that there was no reckless disregard for the truth by the affiant. In fact, that supplemental video evidence strengthens the Court's basis for concluding that Detective Fallert truthfully testified that he was readily able to accurately identify Williams. In that video, Williams greets Detective Fallert upon Detective Fallert's entry into the PBP interrogation room effusively and warmly — in the Court's judgment, in essentially the same

manner as would longtime friends or relatives. (ECF No. 156-2; ECF No. 156, at 4–8). It appears that Williams submitted that video evidence to the Court in an effort prove that it had been 18 years since Detective Fallert and Williams had last seen each other and thus that Detective Fallert would not have been able to accurately identify Williams from surveillance footage, or that at minimum, the issuing judge should have been told that in the affidavit. But the immediate mutual recognition between Williams and Detective Fallert in the video evidence belies the Defendant's intended point as to both Defendant Fallert's credibility and that the time between his interactions with Williams fogged his ability to recognize Williams. And although Williams does state in the video that he "ain't seen [Detective Fallert] in 18 years," (ECF No. 156, at 6), Detective Fallert never agreed that it had been that long. Detective Fallert simply stated, "it's been a while." (*Id.*). The video also suggests that Detective Fallert may have seen Williams more recently in a context in which Williams had not seen Detective Fallert — at one point, Detective Fallert states to Williams that he "saw [him] out on the street somewhere." (ECF No. 156, at 5). And the Defendant has not submitted actual admitted evidence backing up his contention about an 18-year interval.

As such, more noteworthy to the Court than what this evidence indicates about when, exactly, the Defendant and Detective Fallert last saw one another is that the video showed a remarkable level of mutual and almost excited familiarity between the two. The pair recognize each other instantaneously and greet each other as old, long-time acquaintances would. Not only does Detective Fallert begin the conversation with clear knowledge of the identity of the Defendant, but the Defendant has clear familiarity with Detective Fallert, too. At one point very early in their encounter in the interview room, the Defendant says, "my man fuckin' Fallert." (ECF No. 156, at 6). This familiarity between Detective Fallert and the Defendant strengthens the Court's conclusion that Detective Fallert and Detective Knight testified truthfully when they

testified that when Detective Fallert viewed the video surveillance footage of the shooting outside Ace's & Deuce's Lounge, he was able to immediately and with complete certainty identify the suspect as Wayne Williams. And beyond that, the Defendant simply has not advanced credible evidence to support the inclusion into a "reformed" affidavit as to his 10 or 18-year take on the time interval of the last encounter between Williams and Detective Fallert. His arguments about that time interval are just that — arguments. "Reforming" the affidavit based only on argument is outside of the bounds of *Franks* and *Wilson,* and to the extent that the Defendant offers the interrogation room video evidence to undercut the veracity of the testimony by Detectives Fallert and Knight about the certainty of Detective Fallert's identification of the Defendant, it demonstrably fails in that mission. To the extent that Williams argues that information extraneous to the actual record here shows that the time interval between physical interactions between the Defendant and Detective Fallert would undercut the certainty of that familiarity, the interrogation room video confirms the credibility of Detective Fallert's testimony and of his statements to Detective Knight as the latter officer was preparing his affidavit.

The long and the short of it is that the Defendant has not advanced actual material evidence that Detective Knight recklessly failed to include in the affidavit necessary information as to Detective Fallert's identification of the Defendant, and over and above that, the evidence that he offers to undercut Detective Fallert's testimony about his ability to identify Williams in fact instead demonstrably proves it.

3.   Nexus Between Shooting, 510 Lincoln Avenue, and Wayne Williams

The Court also rejects the Defendant's arguments that there was not sufficient evidence in the warrant affidavit connecting the shooting to 510 Lincoln Avenue for that residence to be searched, or connecting 510 Lincoln Avenue to him, Wayne Williams.

The residence at 510 Lincoln Avenue first became connected to the shooting due to the so-called getaway car. The affidavit supporting the first search warrant of the residence states that after the suspect discharged his firearm into the victim's vehicle outside of Ace's & Deuce's — which was captured on surveillance video — the suspect "enter[ed] into the driver side of a light silver Chrysler and turns left onto Fifth Ave traveling inbound towards downtown." (ECF No. 93-2). The license plate of that silver Chrysler was captured within several minutes on the Bloomfield Bridge license plate reading camera. The license plate — Pennsylvania KXY-4958 — was registered to one Jamie Koon at 510 Lincoln Avenue, Pittsburgh, Pennsylvania, 15206. (*Id.*). Notwithstanding the Defendant's argument to the contrary, that evidence is what is called a "connection," and is a direct and strong one between the getaway car and 510 Lincoln Avenue.

But officers with USMS and the Western Pennsylvania Fugitive Task Force did not just rely on that evidence. They continued to investigate the nexus between 510 Lincoln Avenue and the shooting by observing the residence on multiple days. Officers saw the silver Chrysler outside the residence on those days and an individual "matching the physical description and characteristics" of the shooting suspect entering and exiting 510 Lincoln Avenue on those days, as well as entering and exiting the silver Chrysler with the license plate KXY-4958 on those days. (*Id.*). The identity of the suspect, as it pertains to the search warrant of 510 Lincoln Avenue, is not particularly relevant. The fact that the suspect — whoever he was — used a vehicle registered to that address as the getaway vehicle and was subsequently observed entering and exiting the residence at which that vehicle was registered and parked, as well as entering and exiting the getaway vehicle itself in the days following the shooting, is reason enough for law enforcement officers to be properly and legitimately interested in searching 510 Lincoln Avenue for evidence

of the shooting. There is a clear nexus between the shooting, 510 Lincoln Avenue, and the silver Chrysler.

The Defendant argues that the police did not provide a detailed description of the suspect's physical characteristics for those law enforcement personnel to surveil 510 Lincoln Avenue. During the latest oral argument on December 17, 2025, the Defendant argued that by not describing with particularity the features of the suspect seen repeatedly coming in and out of the residence, the affiant deprived the judicial officer of her rightful prerogative to weigh the evidence to conclude whether there was sufficient probable cause to grant the search warrant. The affidavit stated that "a black male matching the physical description and characteristics of Wayne Williams" was observed at the residence and entering and exiting the Chrysler. (ECF No. 93-2, at 3). The bottom line is that the Court finds that what was in the affidavit is sufficient to support the search *of the residence* — a point-by-point recitation of the suspect's physical attributes was not necessary for that purpose. And, critically, given the direct nexus between the shooting, the getaway car and 510 Lincoln Avenue, even if the affidavit were reformed by taking out the references to the description of the suspect, there was nonetheless plenty of probable cause to search *that residence* for evidence related to the Ace's & Deuce's shooting, given that the getaway car was matched to that residence, and individuals coming in and out of the residence are tied to the car. It was more than legitimate for the police and the issuing judge to conclude that evidence from the shooting may likely be found in the house, and the reasons supporting that conclusion were laid out for the issuing judge.

As noted above, the Defendant also takes issue with the fact that an anonymous tip was one piece of evidence the police received through the initial investigation. But there is no constitutional issue with police using an anonymous tip as a starting place to kick off a larger and

more involved investigation to identify a suspect. In the Third Circuit, if an anonymous tip is corroborated, the reviewing court defers to the magistrate judge's determination of probable cause. *See United States v. Ritter*, 416 F.3d 256, 263–64 (3d Cir. 2005) (affirming magistrate judge's decision to grant warrant based on affidavit in which officer receiving anonymous tip and "made no attempt to verify the informant's allegations through further independent investigation" but had familiarity with the property from previous seizures therein). Here, the warrant affidavit was based on much more than a tip, so cases dealing with a warrant based only on a tip are inapposite. Given all of that, the Court need not dwell further on the Defendant's argument concerning the anonymous tip — the tip was sufficiently investigated and corroborated and was not the basis for the issuance of the challenged warrant.

### 4.  Aggregate Evidence

Under the *Frost* directive, the relevant comparator when challenging the sufficiency of the evidence supporting a warrant is an affidavit that provides the judicial official not only with additional facts that would benefit the defendant, but also those less favorable facts for the defendant that could have been included by the affiant to paint the complete picture.

As such, the relevant comparator paragraph for the affidavit would read, in relevant part, something to the effect of the below, with the newer "reformed" information in *italics*:

> On December 18, 2021, a shooting occurred outside the Ace's Deuce's Bar. Surveillance footage from inside the bar and outside the bar was obtained and reviewed by the affiant. The video showed an interaction between the shooter and the victim inside the bar. The video showed the shooter wearing descriptive/unique clothing inside the bar (black hooded jacket with light colored stripes on the side and a black hat). The video inside the bar showed the shooter's face and showed the shooter initially wearing a black COVID mask inside the bar but he removed the mask from his face, fully divulging his facial features to the surveillance camera. *At the scene of the shooting, officers received an anonymous tip that the suspect was named "Wayne Williams."*
> The video outside the bar showed the shooter wearing the same descriptive/unique clothing as the man inside the bar who had an altercation with

23

the victim. The video shows the shooter discharge a firearm into a vehicle occupied by the victim. The video then shows the shooter enter a silver Chrysler and drive away from the scene. The Chrysler is picked up on several city cameras, and only a couple minutes later, the Chrysler's license plate is picked up on an automatic license plate reader in close proximity to the shooting (at Washington Place and Bigelow Blvd toward Bloomfield). The license plate is identified as Pennsylvania KXY-4958, registered to Jamie Koon at 510 Lincoln Avenue, Pittsburgh, PA, 15206, per PennDOT records.

*On December 21, a photo array containing Wayne Williams' photograph among eight photographs was shown to the shooting victim. The victim was unable to make any identification with 100 percent certainty, but the victim selected two of the eight photographs as the potential suspect, saying, "These two right here. Could be them two." One of those two photographs was of Wayne Williams.*

Det. Fallert was shown the video footage displaying a clear picture of the suspect male inside the bar. *Detective Fallert was not told by anyone prior to reviewing the footage that Wayne Williams was a suspect.* Detective Fallert is familiar with the suspect from prior encounters *with* and *multiple arrests of him. He had seen Wayne Williams outside of the Allegheny County Courthouse about 10 years ago and had also seen Wayne Williams on the street outside of 510 Lincoln Avenue with his girlfriend who lived at that address. Detective Fallert does not remember exactly when the last time he saw Wayne Williams was, but he believes that it was not longer than 5 years prior to his reviewing the footage from Ace's & Deuce's.* Upon review of the video, Detective Fallert positively identified the shooter as Wayne Williams with 100 percent certainty.

From December 27–29, U.S. Marshals and Task Force Officers surveilled 510 Lincoln Avenue. On both December 27 and December 29, officers observed a black male matching the physical description and characteristics of Wayne Williams at 510 Lincoln Ave. On December 29, the male exited the front door of 510 Lincoln Avenue and entered the driver's seat of the silver Chrysler with the above license plate. The owner of the Chrysler, Jamie Koon, is also seen entering and exiting the residence and the vehicle.

This reformed affidavit provides more than enough of a basis for a judicial officer to authorize a search of 510 Lincoln Avenue. But beyond that, the affidavit as it was written — without the italicized portions — is also sufficient to establish probable cause for the search. The Defendant's Motion to Suppress on this basis thus fails.

### B.  Defendant's Staleness Argument

The Court can make short work of the Defendant's remaining arguments in support of his Motion to Suppress, as none hold water.

During the oral argument of December 17, 2025, the Defendant argued for the first time that the evidence supporting the search warrant was unduly "stale" because of the amount of time that had elapsed between the shooting incident on December 18, 2021, and when law enforcement obtained the first 510 Lincoln Avenue search warrant on December 29, 2021, and executed the search warrant on December 30, 2021. The Government opposed that argument and asserted that the amount of time that elapsed was well within the proper limits of permissible timing, especially given the fact that the evidentiary items the initial search warrant sought (such as guns and ammo) were durable rather than disposable or consumable goods.

A staleness analysis must consider various factors, including "the nature of the crime, of the criminal, of the thing to be seized, and of the place to be searched." *United States v. Williams*, 124 F.3d 411, 420 (3d Cir. 1997) (quotations omitted). When the objective of a warrant is to search for firearms and ammunition, as was the case in the warrant at issue here, the Third Circuit has noted that intervening time lapses are less salient because such items are not perishable. *United States v. Strickland*, 237 F. App'x 773, 778 (3d Cir. 2007). The court of appeals has also recognized that residences are likely locations for storage of firearms. *Id.* Even in cases involving evidence that is more likely to be disposed of or consumed quickly, the Third Circuit has repeatedly held that a two-week gap between the incident and the issuance of a search warrant does not constitute impermissible staleness. *See, e.g.*, *United States v. Ruffin*, 664 F. App'x 224, 225 (3d Cir. 2016); *United States v. Morgan*, 562 F. App'x 123, 129 (3d Cir. 2014); *United States v. Caple*, 403 F. App'x 656, 659 (3d Cir. 2010).

Considering the record here, and the applicable case law, the time interval between the shooting at the Ace's & Deuce's and the execution of the initial search warrant for guns and ammo

at 510 Lincoln Avenue did not undercut the probable cause to support the warrant and the search, and there is no basis to suppress the fruits of the search on such grounds.

### C.   Defendant's Argument Under Federal Rule of Criminal Procedure 41

Next, the Court turns to the Defendant's argument — also raised for the first time at oral argument on December 17, 2025 — that the evidence obtained pursuant to or as a result of the first 510 Lincoln Avenue search warrant must be suppressed because Williams was not promptly hand-delivered a copy of the search warrant as he was being arrested on December 30, 2021. The Court can also make short work of this argument. Here's why.

First, in making that argument, defense counsel relied on and argued from an *overruled* Ninth Circuit decision from 1999 for the proposition that Williams should have been given the search warrant the moment that he asked for it while being arrested in the early morning hours on December 30, 2021. And beyond the fact that the Ninth Circuit decision the Defendant expressly relied on was overruled, there is also controlling Supreme Court and Third Circuit precedent that cuts in the exact opposite direction as the Defendant's argument. Notably, all of that was laid out in the Government's opposition, is accurate, and defense counsel did not respond to those realities, and simply stated that Williams stood by his arguments made at the hearing. (ECF No. 203).

Federal Rule of Criminal Procedure 41(f)(1)(C) provides as follows: "The officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property." The Ninth Circuit decision that the Defendant cited at Oral Argument, *United States v. Gantt*, held that Rule 41 required law enforcement officers to provide anyone at a residence subject to a search warrant with a copy of the warrant "at the outset of the search." 194 F.3d 987, 993 (9th Cir. 1999). But the Supreme Court overruled this

holding from *Gantt* in 2006 in *United States v. Grubbs*, holding that "[the respondent's] argument assumes that the executing officer must present the property owner with a copy of the warrant before conducting his search. In fact, however, neither the Fourth Amendment nor Federal Rule of Criminal Procedure 41 imposes such a requirement." 547 U.S. 90, 98–99. Subsequently, the Third Circuit held that "no constitutional right was violated" when a police officer "fail[ed] to give [a defendant] the warrant and affidavit during the search." *Hart v. Gordon*, 591 F. App'x 125, 128 (3d Cir. 2014). Beyond the reality that *Gantt* was an outlier from another Circuit to begin with, its vitality is no more, and it does not and cannot inform the Court's decision on suppression.

Beyond that, the Defendant has advanced no actual record evidence that the searching officers did not comply with the mandates of Rule 41, *Grubbs*, and *Hart* during the searches and arrests on December 30, 2021. The video clips played during the oral argument on December 17, 2025, show only that one police officer did not give Williams a copy of a warrant at the exact moment that Williams asked for a "warrant" when he was being arrested. Nothing more. Nor has the Defendant advanced evidence that the searching officers did not otherwise comply with that Rule by giving a copy of it to Jamie Koon, or simply leaving a copy at 510 Lincoln Avenue. On top of that, at the time of Williams's arrest, there were many multiple warrants outstanding, and it was unclear in the video that the defense advanced *which* warrant Williams was supposedly asking for. Thus, this argument is baseless as both a factual and legal matter.

There is a reason why courts ordinarily do not permit parties to present evidence or arguments at oral argument that have not been briefed or foreshadowed beforehand. Counsel for the Defendant took the Court (and the Government) off guard in presenting an argument that neither had come prepared to consider, and in doing so, presented an argument based on overturned out-of-Circuit precedent that is contrary to our Circuit's and Supreme Court law. The Court

overrules the Defendant's oral Motion to Suppress on Rule 41 grounds for all of the reasons noted above.

### D.  Defendant's Other Arguments

The Defendant makes several other seemingly passing or collateral arguments in his filings supposedly supporting the Motion to Suppress. These arguments strike the Court as extraneous because they do not actually relate to the Motion to Suppress the evidence obtained pursuant to the search warrant for 510 Lincoln Avenue, which is the actual subject of the suppression motion. These arguments fail, but for completeness's sake, the Court discusses them here.

In his supplemental briefing, the Defendant highlights the fact that while police officers were searching 510 Lincoln Avenue pursuant to the search warrant at issue in this Motion, officers requested another search warrant to also search for narcotics at the residence. (ECF No. 156, at 13). An officer made such a request via radio for the simple reason that he observed evidence of narcotics in the residence. That warrant request was granted by Judge Bigley at 8:05 AM that day. (*See* ECF No. 156-8). Far from being evidence of some sort of ill-defined police impropriety, the officer's radio request is evidence of the contrary. Officers likely could have, under the plain view exception to the Fourth Amendment's warrant requirement, simply seized any evidence of illegal drug activity that was in plain view — *without* a warrant. Instead, officers applied for a second search warrant for that residence and were granted it. Seeking that second warrant is simply not evidence of a slipshod approach to executing the first warrant that should trigger suppression. If anything, it would be evidence of cautious police work.

The Defendant also highlights the "the failure to include the identification of the Defendant as the shooting suspect in the affidavit for the Chrysler Sebring warrant" as an alleged defect in police conduct during the investigation at issue. (ECF No. 156, at 15). In addition to being

unrelated to the present Motion to Suppress, that claim has no merit: there is no requirement to include the name of a suspect in a search warrant application when a vehicle is involved in a crime and the warrant is sought for the vehicle, and the Defendant has pointed to none. That matter need not be analyzed further.

### V.    Conclusion

For the reasons explained above, the Court DENIES the Defendant's Motion to Suppress, (ECF No. 93), in its entirety, including all of its supplementations and iterations.

An appropriate Order will issue.


s/ Mark R. Hornak
Mark R. Hornak
United States District Judge


Dated: January 12, 2026